ORAL ARGUMENT NOT YET SCHEDULED
No. 12-1228

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

THE NATIONAL OILSEED PROCESSORS ASSOCIATION, CORN REFINERS
ASSOCIATION, AND NATIONAL GRAIN AND FEED ASSOCIATION,

Petitioners,

AMERICAN FEED INDUSTRY ASSOCIATION,

Intervenor for Petitioners,

v.

OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, ET AL.

Respondents,

CHANGE TO WIN, ET AL.,

Intervenors for Respondents.

_____

On Petition for Review of a Final Rule Issued
By the Occupational Safety and Health Administration

**INITIAL BRIEF OF PETITIONERS AND INTERVENOR FOR
PETITIONERS**

Marc L. Fleischaker
Donald C. McLean
Valerie N. Butera
ARENT FOX LLP
1717 K Street, NW
Washington, DC 20036-5342
*Counsel for Petitioners and
Intervenor for Petitioner*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and *Amici*

The parties in this case are Petitioners National Oilseed Processors Association ("NOPA"), Corn Refiners Association ("CRA"), and the National Grain and Feed Association ("NGFA"), and Respondents, Occupational Safety and Health Administration ("OSHA"), United States Department of Labor, and Thomas E. Perez, Secretary, United States Department of Labor.

Intervenor for Petitioners ("Intervenor") is the American Feed Industry Association ("AFIA").[1]

Intervenors for Respondents are Change to Win, International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO.

No entity or individual has sought to file as an *amicus curiae* with respect to Petitioners' Petition for Review at this time.

### B.    Rulings Under Review

The ruling under review is a final rule titled "Hazard Communication" (Docket No. OSHA-H022K-2006-0062), published in the Federal Register by OSHA on March 26, 2012, at 77 Fed. Reg. 17,574 (the "Final Rule") (J.A. __).

---

[1] Intervenor AFIA joins in Petitioners' Initial Brief and will not be filing a separate initial brief.

i

The Final Rule amends certain provisions of OSHA's Hazard Communication Standard, 29 C.F.R. § 1910.1200.

## C.    Related Cases

Two other entities petitioned this Court for review of the Final Rule.  These cases are *American Petroleum Institute v. Secretary of Labor*, No. 12-1227 ("*API*"), and *American Tort Reform Ass'n v. OSHA*, No. 12-1229 ("*ATRA*").  By Order dated June 21, 2012, the present case (No. 12-1228) was consolidated with *API* and *ATRA*.  In *ATRA*, the petitioner sought review of OSHA's revision of 29 C.F.R. § 1910.1200(a)(2) regarding preemption of state law.  *See* ATRA's Initial Brief of Petitioner (Docket No. 12-1229, February 25, 2013, #1422267).  By Order dated November 2, 2012, the *ATRA* case was severed and proceeded to briefing and argument (#1402979).  This Court's decision in the *ATRA* case is reported at *American Tort Reform Ass'n v. OSHA*, 738 F.3d 387 (D.C. Cir. 2013).

In *API*, the petitioner stated that it may raise issues related to certain provisions of the Hazard Communication Standard regarding "complex mixtures" and "combustible dust."  *See* API's Non-Binding Statement of Issues to be Raised (Docket No. 12-1227, July 5, 2012, #1382212).  Petitioners and Intervenor were recently advised that API and OSHA have reached a settlement agreement.

## D.    Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1,

Petitioners and Intervenor make the following corporate disclosure statements.

Petitioner NOPA is an association of companies engaged in the production of vegetable meals and vegetable oils from oilseeds, including soybeans. Its members process more than 1.6 billion bushels of oilseeds annually.

Petitioner CRA is an association representing the corn wet milling and corn refining industry. Its members process more than 1.7 billion bushels of corn each year.

Petitioner NGFA is an association of grain elevators, feed and feed ingredient manufacturers, grain and oilseed processors, biofuel producers, exporters, livestock and poultry integrators, and firms providing products and services to the grain and feed industry. Its members handle more than seventy percent of the U.S. grain and oilseed crop.

Intervenor AFIA is an association representing the U.S. animal feed industry and its suppliers. Member-companies are livestock feed and pet food manufacturers, integrators, pharmaceutical companies, ingredient suppliers, equipment manufacturers and companies which supply other products, services and supplies to feed manufacturers.

Petitioners and Intervenor are operated for the purpose of promoting the general commercial, professional, legislative, or other interests of their respective memberships. Petitioners and Intervenor have no parent companies, subsidiaries,

or affiliates with shares or debt securities issued to the public.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

    A.    Parties and *Amici* ...................................................................i

    B.    Rulings Under Review .......................................................i

    C.    Related Cases .................................................................. ii

    D.    Corporate Disclosure Statement ....................................... ii

TABLE OF AUTHORITIES ................................................... viii

GLOSSARY ..................................................................... xiii

JURISDICTIONAL STATEMENT ............................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............1

PERTINENT STATUTES AND REGULATIONS ...........................2

STATEMENT OF FACTS RELEVANT TO THE ISSUES SUBMITTED
FOR REVIEW ...................................................................2

    The Petitioners and Intervenor for Petitioners................................2

    The Hazard Communication Standard ...........................................3

    Additional OSHA Material on Combustible Dust and the Hazard
        Communication Standard ...............................................12

    The Grain Handling Standard......................................................13

    The Combustible Dust Rulemaking ..............................................14

SUMMARY OF THE ARGUMENT ........................................17

STANDING .......................................................................27

    Article III Standing.....................................................................28

    Prudential Standing.....................................................................33

STANDARD OF REVIEW .................................................................35

    The Administrative Procedure Act ............................................35

    The OSH Act ............................................................................36

    The Due Process Clause of the United States Constitution...........37

ARGUMENT .................................................................................38

    I.    OSHA Violated the APA by Failing to Provide Appropriate
        Notice and Opportunity for Comment to the Grain Handling
        Industry...........................................................................38

    II.   OSHA's Inclusion of Combustible Dust from Grain Dust in the
        Final Rule as  a Hazardous Chemical Is Not a Logical
        Outgrowth of the Notice of Proposed Rulemaking's General
        Proposal to Include "Combustible Dust" as a Regulated
        Substance..........................................................................44

    III.  "Combustible Dust" Should Be Defined and Addressed in a
        Coordinated Fashion Through the Specific OSHA Rulemaking
        That Was Designed to Deal With It, Not in the Final Rule
        Where It Is Not Even Defined; This Is Improper Rulemaking by
        the Agency.......................................................................47

        A.    OSHA's Advance Notice of Proposed Rulemaking for
            Combustible  Dust..................................................47

        B.    OSHA's Combustible Dust Rulemaking Will Address the
            Many Complex, Scientific Factors Involved in Defining
            "Combustible Dust.".................................................48

        C.    OSHA's Combustible Dust Rulemaking Will Address the
            Various and Inconsistent Definitions of "Combustible
            Dust" Developed by Standards-Developing Organizations. ....49

        D.    Status of OSHA's Combustible Dust Rulemaking...................52

E.    OSHA Has Violated the OSH Act and the Due Process Clause by Failing to Define "Combustible Dust" in the Final Rule, and by Expecting The Regulated Community and Enforcement Authorities to Reconcile Inconsistent Voluntary Standards Regarding Combustible Dust for Purposes of Interpreting the Final Rule. ...................................53

1.    OSHA Has Violated the OSH Act..................................53

2.    OSHA Has Violated the Due Process Clause. ...............55

CONCLUSION .....................................................................................59

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ..........61

CERTIFICATE OF SERVICE ...............................................................62

## TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">CASES</span>

*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Marshall,*
617 F.2d 636 (1979), *aff'd in part, rev'd in part on other grounds,*
*Textiles Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490 (1981)...............................54

*\*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. OSHA,*
965 F.2d 962 (11th Cir. 1992)....................................................24, 36, 37, 53, 54

*American Petroleum Institute v. Secretary of Labor*,
No. 12-1227 ("API").............................................................................. ii

*American Tort Reform Ass'n v. OSHA,*
738 F.3d 387 (D.C. Cir. 2013)............................................................... ii

*American Tort Reform Ass'n v. OSHA,*
No. 12-1229 ("ATRA").......................................................................... ii

*Ass'n of Private Sector Colls. & Univs. v. Duncan,*
681 F.3d 427 (D.C. Cir. 2012)........................................................44, 47

*Big Mama Rag, Inc. v. United States,*
631 F.2d 1030 (D.C. Cir. 1980)...........................................................59

*Clarke v. Secs. Indus. Ass'n,*
479 U.S. 388 (1987)............................................................................35

*Comcast Cable Commc'ns, LLC v. FCC,*
717 F.3d 982 (D.C. Cir. 2013).............................................................59

*Cunney v. Bd. of Trs.*,
660 F.3d 612 (2d Cir. 2011) ...............................................................56

*FCC v. Fox Television Stations, Inc.*,
132 S. Ct. 2307 (2012).................................................................25, 55

*Ford Motor Co. v. Texas Dep't of Transp.*,
264 F.3d 493 (5th Cir. 2001) .........................................................37, 38

\* Authorities upon which we chiefly rely are marked with asterisks.

*Gates & Fox Co. v. OSHRC*,
    790 F.2d 154 (D.C. Cir. 1986)..........................................................57

*Gen. Elec. Co. v. EPA*,
    53 F.3d 1324 (D.C. Cir. 1995)...................................................56, 57

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)....................................................................25, 55

*Int'l Union, UMWA v. Mine Safety & Health Admin.*,
    407 F.3d 1250 (D.C. Cir. 2005)......................................................38

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..........................................................................28

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    132 S. Ct. 2199 (2012)..............................................................33, 34

*MCI Telecomms. Corp. v. FCC*,
    57 F.3d 1136 (D.C. Cir. 1995)........................................................38

*McLouth Steel Prods. Corp. v. Thomas*,
    838 F.2d 1317 (D.C. Cir. 1988)......................................................41

*Motor Vehicle Mnfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)....................................................................35, 36

*Nat'l Grain & Feed Ass'n v. OSHA*,
    866 F.2d 717 (5th Cir. 1989) .........................................................53

*Nat'l Maritime Safety Ass'n v. OSHA*,
    649 F.3d 743 (D.C. Cir. 2011)........................................................55

*Papachristou v. City of Jacksonville*,
    405 U.S. 156 ....................................................................................59

*Paralyzed Veterans of Am. v. D.C. Arena L.P.*,
    117 F.3d 579 (D.C. Cir. 1997)........................................................44

*\*Sabre, Inc. v. Dep't of Transp.*,
    429 F.3d 1113 (D.C. Cir. 2005).............................................31, 32, 35

ix

*Shell Oil Co. v. EPA*,
    950 F.2d 741 (D.C. Cir. 1991).................................................47

*\*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002)...........................................28, 35

*Stilwell v. Office of Thrift Supervision*,
    569 F.3d 514 (D.C. Cir. 2009)................................................31

*Throckmorton v. NTSB*,
    963 F.2d 441 (D.C. Cir. 1992)...............................................37

*United Steelworkers of Am. v. Marshall*,
    647 F.2d 1189 (D.C. Cir. 1980).........................................37, 53

*Wagner Electric Corp. v. Volpe*,
    466 F.2d 1013 (3d Cir. 1972) .................................................41

*Webster v. Doe*,
    486 U.S. 592 (1988)................................................................33

**STATUTES**

U. S. Constitution, amend. V, Due Process Clause ..........................1, 37

5 U.S.C. § 500, *et seq.*..................................................................1

5 U.S.C. § 553(b)(3)...................................................................44

29 U.S.C. § 655(b) ..................................................................1, 34

*\*29 U.S.C. § 655(f)................................................1, 24, 34, 36, 53

29 U.S.C. § 659(a) .......................................................................32

29 U.S.C. § 666(a) .......................................................................32

**OTHER AUTHORITIES**

29 C.F.R. § 1910.272 .....................................................13, 14, 17, 51

29 C.F.R. § 1910.1000 ...................................................................5

29 C.F.R. § 1910.1200(a)(2)......................................................... ii

29 C.F.R. § 1910.1200(b)(5)(iii) (2012) ................................................9

29 C.F.R. § 1910.1200(d) (1994)...........................................................3

*29 C.F.R. § 1910.1200(d)(1)..........................................................8, 9, 42

*29 C.F.R. § 1910.1200(f) (1994) .....................................................4, 39

29 C.F.R. § 1910.1200(g) (1994)...........................................................4

29 C.F.R. § 1910.1200(h) (1994)...........................................................4

48 Fed. Reg. 53,280 (Nov. 25, 1983) .....................................................3

52 Fed. Reg. 31,852 (Aug. 24, 1987) ....................................................3

*52 Fed. Reg. 49,592 (Dec. 31, 1987)........................................13, 22, 40

*59 Fed. Reg. 6126 (Feb. 9, 1994) .......................................4, 19, 22, 40

*71 Fed. Reg. 53,617 (Sept. 12, 2006) ..................................5, 6, 7, 39

*74 Fed. Reg. 50,280 (Sept. 30, 2009) ..................................7, 9, 11, 22, 39, 42, 45

*74 Fed. Reg. 54,334 (Oct. 21, 2009).....................8, 14,  20, 23, 47, 48, 50, 51, 52

*77 Fed. Reg. 17,574 (Mar. 26, 2012) ...........................1, 9,10, 11, 19, 42, 46, 49

79 Fed. Reg. 1186 (Jan. 4, 2014) ........................................................52

**MISCELLANEOUS**

Office of Program Evaluation Occupational Safety and Health
    Administration (February 2003), *available at*
    https://www.osha.gov/dea/lookback/grainhandlingfinalreport.html ................14

OSHA's Regulatory Agenda, Combustible Dust, RIN 1218-AC41 (Fall
    2013), *available at*
    http://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201310 ............52

U.N. Econ. Comm'n for Eur., Globally Harmonized System of
    Classification and Labelling of Chemicals, Fourth Rev. Ed. (2011),
    *available at*
    http://www.unece.org/trans/danger/publi/ghs/ghs_rev04/04files_e.html ............6

U.S. Chemical Safety Board, Mission, *available at*
    http://www.csb.gov/about-the-csb/mission/ ......................................................42

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| ANPR | Advance Notice of Proposed Rulemaking |
| SDS | Safety Data Sheets |
| Final Rule | Hazard Communication Standard, as amended and published in the Federal Register, 77 Fed. Reg. 17,574 (March 26, 2012) |
| GHS | United Nations' Globally Harmonized System of Classification and Labeling of Chemicals |
| HCS | Hazard Communication Standard, as it existed prior to the promulgation of the amended version of the rule published in the Federal Register on March 26, 2012 |
| NPRM | Notice of Proposed Rulemaking |
| OSHA | Occupational Safety and Health Administration |
| OSH Act | Occupational Safety and Health Act of 1970, as amended |
| HazCom ANPR | Advance Notice of Proposed Rulemaking, Hazard Communication, published in the Federal Register, 71 Fed. Reg. 53,617 (Sept. 12, 2006) |
| Proposed Rule | Hazard Communication Proposed Rule and Request for Comments, published in the Federal Register on 74 Fed. Reg. 50,280 (Sept. 30, 2009) |
| Dust ANPR | Advance Notice of Proposed Rulemaking on Combustible Dust, published in the Federal Register, 74 Fed. Reg. 54,334 (Oct. 21, 2009) |

## JURISDICTIONAL STATEMENT

This Petition seeks review of a final rule promulgated by OSHA, titled

"Hazard Communication" (Docket No. OSHA-H022K-2006-0062), published in

the Federal Register on March 26, 2012. 77 Fed. Reg. 17,574 ("Final Rule") (J.A.

__). OSHA promulgated the Final Rule to modify the Hazard Communication

Standard ("HCS") pursuant to its authority under Section 6(b)(7) of the

Occupational Safety and Health Act ("OSH Act"), 29 U.S.C. § 655(b)(7). *See id.*

at 17,575 (J.A. __). The effective date of the Final Rule was May 25, 2012. *Id.*

at 17,574 (J.A. __). The Petitioners filed a timely petition for review on May 24,

2012. (#1375983). The Intervenor's Motion to Intervene was granted on

September 25, 2012 (#1396383). This Court has jurisdiction under 29 U.S.C.

§ 655(f) to review the issuance or modification of an OSHA standard.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Did OSHA violate the Administrative Procedure Act, 5 U.S.C. § 500,

*et seq.* ("APA"), the OSH Act, the Due Process Clause of the Constitution of the

United States ("Due Process Clause"), or some combination of these, by including

"combustible dust" in the Final Rule as a "hazardous chemical," by doing so

without defining the critical term "combustible dust," by doing so without

providing adequate notice and opportunity for comment to interested persons, and

by doing so when OSHA is currently conducting a separate rulemaking specifically

1

focused on combustible dust?

2.      Did OSHA violate the OSH Act or the Due Process Clause, or both, by failing to define combustible dust in the Final Rule and then expecting the regulated community to determine which of their products are subject to the combustible dust provisions of the Final Rule by consulting several widely varying and inconsistent standards regarding combustible dust, none of which has passed through OSHA's rulemaking process?

## PERTINENT STATUTES AND REGULATIONS

The text of relevant statutes and regulations is set forth in the separately-bound Addendum to this brief.

## STATEMENT OF FACTS RELEVANT TO THE ISSUES SUBMITTED FOR REVIEW

### The Petitioners and Intervenor for Petitioners

The Petitioners and Intervenor are associations that collectively represent thousands of businesses involved in the storage, use and processing of grain, feed and other agricultural products.  Many members of each of the associations (hereafter, the "grain handling industry") receive, handle, process and transport grain, feed, or both in one way or another.

2

**The Hazard Communication Standard**

The Hazard Communication Standard ("HCS")[2] was first promulgated in 1983 to regulate employers engaged in chemical manufacturing. Hazard Communication, 48 Fed. Reg. 53,280 (Nov. 25, 1983) (codified at 29 C.F.R. § 1910.1200) (J.A. __). The purpose of the HCS was to "ensure that the hazards of all chemicals produced or imported by chemical manufacturers or importers [were] evaluated, and that information concerning their hazards [was] transmitted to affected employers and employees …." *Id.* at 53,340 (J.A. __).

In 1987, OSHA expanded the coverage of the HCS to regulate other industries where employees could potentially be exposed to hazardous chemicals. Hazard Communication, 52 Fed. Reg. 31,852 (Aug. 24, 1987) (codified at 29 C.F.R. § 1910.1200) (J.A. __). In 1994, OSHA made further changes and technical amendments to the HCS. Hazard Communication, 59 Fed. Reg. 6126 (Feb. 9, 1994) (codified at 29 C.F.R. § 1910.1200) (J.A. __). No other changes were made to the HCS before the promulgation of the Final Rule in 2012.

Chemical manufacturers and importers were subject to several major requirements under the HCS. Specifically, they were required to make a determination of the hazards related to the products that they manufactured. 29

_____

[2] References to the Hazard Communication Standard as it existed prior to the promulgation of the amended version of the rule published on March 26, 2012, will be referred to as the "HCS." The version of the Hazard Communication Standard that was promulgated on March 26, 2012, will be referred to as the "Final Rule."

3

C.F.R. § 1910.1200(d) (1994) (Addendum A-8). Any containers of hazardous

chemicals were to be labeled with a description of the potential hazards associated

with the chemical. 29 C.F.R. § 1910.1200(f) (1994) (Addendum A-8). Chemical

manufacturers and importers were to create or obtain Material Safety Data Sheets

("MSDSs"), that is, documents which provided detailed explanations of the

hazards associated with each of the hazardous chemicals that they manufactured or

imported. 29 C.F.R. § 1910.1200(g) (1994) (Addendum A-8). And, employees

were to be trained about any hazards associated with the hazardous chemicals with

which they worked. 29 C.F.R. § 1910.1200(h) (1994) (Addendum A-8).

The HCS also applied to shipments of certain solid materials. *See* 29

C.F.R.§ 1910.1200(f)(2)(i-iii) (1994) (Addendum A-8). Specifically, the HCS

contained labeling and MSDS requirements for shipments of grain and other

solids. *See*, *e.g.*, 29 C.F.R. § 1910.1200(f)(2)(i-ii) (1994) (requiring hazard labels

on shipments of grain but excepting grain from general HCS requirement to label

every container) (Addendum A-8). However, these requirements were not related

to combustible dust from grain dust, and did not even mention combustible dust.

This was appropriate because "combustible dust" was not included within the

definition of "hazardous chemical" under the HCS. Moreover, the HCS contained

a specific discussion within its preamble with respect to dust from grain. Hazard

Communication, 59 Fed. Reg. at 6154-55 (J.A. __). This discussion focused

4

largely on the need to inform employers and employees of the permissible

exposure limits ("PELs") for the inhalation of grain dust.  *Id*.

So, for example, OSHA referred to the American Conference of

Government Industrial Hygienists' threshold limit value ("ACGIH TLV") (that is,

the value established by a health and safety standards-setting organization for PELs

to various substances) for grain dust and mandated that the PELs be included in all

MSDSs for regulated grains.  ("Information regarding this PEL must now appear

on MSDSs for grain.").  *Id*. at 6154 (J.A.  __); *see also* 29 C.F.R. § 1910.1000,

Subpart Z, Table Z-1 (Limits for Air Contaminants) of the HCS (establishing PELs

for three specific grains – oat, wheat and barley) (Addendum A-7).  No other

grains were incorporated into the HCS.  29 C.F.R. § 1910.1000, Subpart Z, Table

Z-1  (Addendum A-7).  There was no mandate whatsoever regarding combustible

dust from grain dust.  This is not surprising in light of the fact that seven years

earlier, OSHA had promulgated the Grain Handling Standard, discussed below,

and the grain handling industry had been long operating under that standard.

Moreover, none of the Petitioners or the Intervenor are aware of any enforcement

proceeding in which OSHA has attempted, prior to adoption of the Final Rule, to

apply the requirements of the HCS to combustible grain dust.

On September 12, 2006, OSHA published an Advance Notice of Proposed

Rulemaking regarding Hazard Communication ("HazCom ANPR").  71 Fed. Reg.

53,617 (Sept. 12, 2006) (J.A. ___).  In the HazCom ANPR, OSHA described its

concern that several different agencies exercised jurisdiction over chemical hazard

communication in the United States.  *Id*. at 53,618 (J.A. ___).  Because these

agencies adopted varying approaches to hazard communication requirements,

OSHA recognized that the regulated community might be confused as to its

compliance obligations.  *Id*. (J.A. ___).  Moreover, international agencies

promulgated diverse and sometimes conflicting hazard communication rules.  *Id*.

(J.A. ___).  Specifically, OSHA was concerned that the varying "[n]ational and

international requirements can create confusion among those who seek to use

hazard information effectively."  *Id*. (J.A. ___).

    In June 1992, the United Nations Conference on Environment and

Development called for the development of a globally harmonized chemical

classification and labeling system, which came to be called the Globally

Harmonized System of Classification and Labeling of Chemicals ("GHS").

*Id*. (J.A. ___).  Following several years of negotiations among international

representatives, the GHS was finalized.  *Id*. at 53,619 (J.A. ___).  The GHS covers

a broad range of health and physical hazards.  *Id*. at 53,621 (J.A. ___).  The GHS

does not mention grain or grain dust.  *See generally* U.N. Econ. Comm'n for Eur.,

Globally Harmonized System of Classification and Labelling of Chemicals, Fourth

Rev. Ed. (2011), *available at*

6

http://www.unece.org/trans/danger/publi/ghs/ghs_rev04/04files_e.html (J.A. __).

OSHA requested input from stakeholders about the GHS, particularly "chemical manufacturers, importers, and employers who produce or distribute hazardous chemicals as currently covered under the HCS" because the adoption of the GHS would have the greatest impact on them. HazCom ANPR at 53,625 (J.A. __).

Notably, grain was not mentioned anywhere in the HazCom ANPR, nor was combustible dust. *See generally* 71 Fed. Reg. 53,617 (Sept. 12, 2006) (J.A. __). And, OSHA did not make any specific reference to the grain handling industry in its solicitation of comments. *Id*. (J.A. __). Three years later, on September 30, 2009, OSHA published its Hazard Communication Proposed Rule and Request for Comments (the "NPRM" or "Proposed Rule"). 74 Fed. Reg. 50,280 (Sept. 30, 2009) (J.A. __).

The concept of regulating combustible dust was introduced for the first time in the Proposed Rule. *Id*. at 50,395 (J.A. __). OSHA explained that there was no precise definition of "combustible dust" and that absence had caused great confusion as to the meaning of the term within the regulated community; thus, it was considering promulgating a "standalone" rule defining and regulating the

7

substance.[3] *Id*. (J.A. ___).  Moreover, OSHA noted that although it had proposed to the United Nations adding criteria for combustible dust to the GHS, combustible dust was not yet included in the GHS.  *Id*. at 50,390 (J.A. ___).

In the Proposed Rule, OSHA said that it was considering including combustible dust in the Final Rule as an "unclassified hazard."  *Id*. at 50,395 (J.A. ___).  In the HCS, OSHA noted, hazard determination required an analysis of hazards associated with possible downstream uses of a product, including any byproduct that could result from such uses.  *Id*. (J.A. ___).  Such hazards were to be included in the MSDSs for the product.  *Id*. (J.A. ___).  In OSHA's view, the hazard determination covered "dusts known to be subject to deflagration and subsequent explosion, *i.e.*, combustible dusts."  *Id*. (J.A. ___).  OSHA cited 29 C.F.R. § 1910.1200(d)(1) of the HCS to support these statements.  *Id*. (J.A. ___).  But, 29 C.F.R. § 1910.1200(d)(1) of the HCS did not require an analysis of hazards associated with possible downstream uses of a product, including possible byproducts.  Rather, it stated that:

> Chemical manufacturers and importers shall evaluate chemicals produced in their workplaces or imported by them to determine if they are hazardous. Employers are not required to evaluate chemicals unless they choose not to rely on the evaluation performed by the chemical manufacturer or importer for the chemical to satisfy this requirement.

_____

[3] The Advance Notice of Proposed Rulemaking on Combustible Dust was published just three weeks after OSHA published its Proposed Hazard Communication Rule.  *See* 74 Fed. Reg. 54,334 (Oct. 21, 2009) (J.A. ___).

29 C.F.R. § 1910.1200(d)(1) (1994) (Addendum A-8).

Again, OSHA did not so much as mention grain or the grain handling industry in its solicitation for comments or give any indication that it intended to regulate combustible dust from grain in the Final Rule. *See generally* 74 Fed. Reg. 50,280 (Sept. 30, 2009) (J.A. __). In fact, the solitary mention of grain in the Proposed Rule was in the proposed language for the Final Rule, which was precisely the same language that had been used in the HCS. *Id*. at 50,441 (J.A. __).

In addition, the grain handling industry had no reason to expect that the edible products which it handles and processes would fall within the definition of "hazardous chemical." It would have been particularly unlikely for the industry to comment regarding this hazard communication regulation, when the Final Rule retains, without change, a longstanding HCS exemption for food products, 29 C.F.R. § 1910.1200(b)(5)(iii) (2012) (J.A. __). That provision exempts both bulk and packaged food products from OSHA regulation under the HCS, because their labeling is subject to the requirements of the Federal Food, Drug and Cosmetic Act, which is enforced by the United States Food and Drug Administration.

OSHA promulgated the Final Rule on March 26, 2012. Hazard Communication, 77 Fed. Reg. 17,574 (Mar. 26, 2012) (J.A. __). In its Final Rule, OSHA said that it modified the HCS to conform to the GHS. *Id*. at 17,574, 17,582

9

(J.A. ___).  But, this was not an accurate statement as to combustible dust, because criteria for combustible dust had not yet been included in the GHS.  *Id*. (J.A. ___).

In the Preamble to the Final Rule, OSHA also admitted that "[i]t is true that a separate rulemaking is ongoing on [combustible dust] in OSHA, and some commenters suggested that the combustible dust issue should therefore not be addressed in this rulemaking."  77 Fed. Reg. at 17,705 (J.A. ___); *see also infra* at Section III.A.  The agency responded that "[w]hile OSHA is currently in the preliminary stages of developing a proposed rule to address combustible dust, the new standard is not expected to be completed for some time."  77 Fed. Reg. at 17,705 (J.A. ___).

OSHA explained that it was not providing a definition of the term "combustible dust" because of the ongoing combustible dust rulemaking, but stated that it had provided guidance, as follows:

> through existing documents, including the Combustible Dust National Emphasis Program Directive CPL 03-00-008.[4]  This directive includes an operative definition, as well as provides information about current responsibilities in this area.  In addition, there are a number of voluntary industry consensus standards (particularly those of the NFPA) that address combustible dust ….

*Id*. (J.A. ___).

---

[4] National Emphasis Programs (NEPs) are not subject to notice-and-comment rulemaking.  OSHA develops NEPs to focus outreach efforts and inspections on specific defined hazards in the workplace.  OSHA's Field Operations Manual, CPL-02-00-150 (Apr. 22, 2011) (J.A. ___).

OSHA explained in the Preamble to the Final Rule that rather than including "combustible dust" in the definition for "unclassified hazards" as it had contemplated in the Proposed Rule, the agency had elected to include "combustible dust" in the definition of "hazardous chemical" in the Final Rule. *Id*. at 17,705 (J.A. __). Because combustible dust has been defined as a "hazardous chemical," "all of the provisions of the standard as amended by the final rule that apply to hazardous chemicals will also apply to combustible dusts …." *Id*. at 17,706 (J.A. __). Therefore, "combustible dusts" will be subject to the revised criteria for classification of chemical hazards; revised labeling provisions that include requirements for use of standardized signal words, pictograms, hazard statements, and precautionary statements; a specified format for safety data sheets [known as MSDSs under the HCS]; related revisions to definitions of terms used in the standard; and requirements for employee training on labels and safety data sheets. 74 Fed. Reg. at 50,280 (J.A. __). In addition, information about hazards related to combustible dust and appropriate protective measures must be conveyed to downstream employers and employees through labels on containers and safety data sheets. *Id*. at 50,284 (J.A. __).[5]

---

[5] Initial employee training was required by December 1, 2013 under the Final Rule. 77 Fed. Reg. at 17,789-90 (J.A. __). Compliance "with all modified provisions of this section" is required by June 1, 2015, subject to certain delineated exceptions. *Id*. (J.A. __).

**Additional OSHA Material on Combustible Dust and the Hazard
Communication Standard**

On December 27, 2013, OSHA released a Standard Interpretation on the

subject of "Classification of Combustible Dusts under the Revised Hazard

Communication Standard."  Memorandum to Regional Administrators from

Thomas Galassi, Director, Directorate of Enforcement Programs (Dec. 27, 2013)

("Standard Interpretation") (J.A. ___).  The memorandum explained that OSHA

had elected not to provide a definition of "combustible dust" in the Final Rule

"[n]oting ongoing efforts at the United Nations … and in the Agency's own

combustible dust rulemaking."  *Id*. (J.A. ___).  It notes that the combustible dust

"NEP" had provided one definition for "combustible dust" and that "a number of

voluntary standards prepared by the National Fire Protection Association (NFPA),

FM-Global, and ASTM International suggest various tests, data, and criteria that

may be used to determine whether a material presents a combustible dust hazard."

*Id*. (J.A. ___).

As noted below, the Standard Interpretation is not a model of clarity and

instructs compliance officers to reference a vast number of differing materials in

determining whether a product constitutes combustible dust under the Final Rule.

*Id*. (J.A. ___).  Specifically, compliance officers were told in making their

assessments to refer to OSHA's own rules, such as the Grain Handling Standard

(which does not define combustible dust) discussed below, and a broad range of voluntary industry standards, none of which have been subject to notice-and-comment rulemaking.

**The Grain Handling Standard**

On December 31, 1987, OSHA promulgated a rule to govern safety in grain elevators (the "Grain Handling Standard").  Grain Handling Facilities, 52 Fed. Reg. 49,592 (Dec. 31, 1987) (J.A. ___).  The Grain Handling Standard contains "requirements for the control of grain dust fires and explosions, and certain other safety hazards associated with grain handling facilities."  *Id*. at 49,625 (J.A. ___). The rule applies to "grain elevators, feed mills, flour mills, rice mills, dust pelletizing plants, dry corn mills, soybean flaking operations, and the dry grinding operations of soycake."  29 C.F.R. § 1910.272(b)(1) (Addendum A-6).  The Grain Handling Standard does not define "combustible dust" but regulates, among other things, "fugitive grain dust," which the rule defines as "combustible dust particles, emitted from the stock handling system, of such size as will pass through a U.S. Standard 40 mesh sieve (425 microns or less)."  29 C.F.R. § 1910.272(c) (Addendum A-6).

OSHA has found that the Grain Handling Standard has been extremely effective in preventing explosions from grain dust.  During a review of the Grain Handling Standard in 2003, OSHA credited the industry with implementing

improved safety procedures "in response to the … National Grain and Feed

Association's guidelines" that began the decline in deaths from grain dust

explosions five years before the agency's grain handling facility regulations took

effect.  Regulatory Review of OSHA's Grain Handling Facilities Standard, [29

CFR 1910.272] Pursuant to Section 610 of the Regulatory Flexibility Act

and Section 5 of Executive Order 12866, Office of Program Evaluation

Occupational Safety and Health Administration (February 2003), *available at*

https://www.osha.gov/dea/lookback/grainhandlingfinalreport.html (J.A.  __).  The

agency also noted that "[OSHA] received comments from union representatives

claiming that, since its promulgation, grain explosions were down 42 percent, and

injuries and deaths from grain explosions were reduced by 60 percent and 70

percent respectively."  Advance Notice of Proposed Rulemaking on Combustible

Dust, 74 Fed. Reg. 54,334, 54,336 (Oct. 21, 2009) (citing Regulatory Review of

OSHA's Grain Handling Standard, Feb. 2003) (J.A.  __).

## The Combustible Dust Rulemaking

Three weeks after its Hazard Communication Proposed Rule and Request

for Comments was published, OSHA issued its Advance Notice of Proposed

Rulemaking on Combustible Dust ("Dust ANPR") on October 21, 2009.  74 Fed.

Reg. 54,334 (Oct. 21, 2009) (J.A.  __).  The Dust ANPR explained that

combustible dust hazards result from a wide variety of materials.  *Id*. (J.A.  __).

14

Materials that could form combustible dust include "wood, coal, plastics, biosolids, candy, sugar, spice, starch, flour, feed, grain, fertilizer, tobacco, paper, soap, rubber, drugs, dried blood, dyes, certain textiles, and metals (such as aluminum and magnesium)." *Id*. (J.A. __).

OSHA said that the HCS was an ineffective vehicle for regulating combustible dust hazards. *Id*. at 54,342 (J.A. __). In a combustible dust study by the U.S. Chemical Safety Hazard and Investigation Board ("CSB"), MSDSs of 140 known substances that produced combustible dust were examined. *Id*. (J.A. __). The CSB found that information in the MSDSs regarding hazards associated with downstream processing of combustible dust was, in many cases, absent or poorly and inadequately conveyed to employers and workers. *Id*. (J.A. __).

Accordingly, OSHA announced its intent to develop "a standard that will comprehensively address the fire and explosion hazards of combustible dust." *Id*. at 54,335 (J.A. __). A single, comprehensive standard regulating combustible dust would, the agency stated, "provide clarity for employers and increased safety for exposed workers." *Id*. at 54,341 (J.A. __). The purpose of the Dust ANPR was to "use the information received in response to this notice in developing a proposed standard for combustible dust." *Id*. at 54,334 (J.A. __).

A major issue OSHA intended to resolve through responses to the Dust ANPR was how to define "combustible dust." The agency explained that "[n]o

15

single, universally accepted definition of combustible dust is available." *Id*. at 54,341 (J.A. ___).  Indeed, having analyzed data collected from a Combustible Dust National Emphasis Program, OSHA found that compliance officers referenced "32 different industry or consensus standards developed by 6 different standards-developing organizations" when issuing citations for hazards arising from combustible dust. *Id*. at 54,340 (J.A. ___).  Among those standards, even in standards published by the same organization, the definition of "combustible dust" varies significantly. *Id*. at 54,341 (J.A. ___).

Emphasizing the difficulty and complexity involved in developing a precise definition of "combustible dust," OSHA explained that a number of factors determine whether a dust can be combustible. *Id*. (J.A. ___).  These factors are both product-related (*e.g.*, particle size) and non-product related (*e.g.*, location of ignition source) and are described in more detail *infra* at Section III.B.

OSHA stated that it needed to consider these and other factors in order to develop a comprehensive standard for combustible dust. *Id*. (J.A. ___).   Through the Dust ANPR, "OSHA is requesting information and comments from the public to evaluate what regulatory action it should take to further address combustible dust hazards within the general industry standards." *Id*. (J.A. ___).   The grain handling industry has been very active in submitting comments with respect to the combustible dust rulemaking. *See*, *e.g*., AFIA, NGFA, and Pet Food Institute

16

Comments, Docket No. OSHA – 2009-0023, Combustible Dust Advance Notice of

Proposed Rulemaking (ANPRM) (Jan. 19, 2010) (J.A. __).

## SUMMARY OF THE ARGUMENT

The three Petitioners and one Intervenor in this petition for review represent

all aspects of the United States grain handling industry:  small country elevators

that store grain raised by farmers; feed mills that store and process grains for

animal feed; processing facilities that take the grain and turn it into foods such as

bread and cereal and vegetable oils; ethanol plants that utilize corn and other

grains; and, large regional and export grain elevators.

This industry is mindful of the risks inherent in products that produce dust

that, under certain circumstances, can result in fires and explosions.  Fires and

explosions can happen when certain types of dust are ignited by an ignition source,

and when there is adequate fugitive dust in the vicinity to fuel a flame front caused

by the ignition source within a confined space.  The grain handling industry,

together with OSHA, became concerned about fires and explosions in the industry

in the 1970s, and the result was the adoption of the Grain Handling Standard,

which is applicable to all facilities handling raw grain.  29 C.F.R. Part 1910.272.

Most companies represented by the petitioning and intervening associations

are subject to the Grain Handling Standard.  This standard requires that every such

facility in the United States conduct employee training, and ensure that potential

17

ignition sources are reduced and properly maintained, and that fugitive dust is

cleaned on a regular basis. That means that in the grain handling industry, most

"downstream users" are already aware of the potential dangers of certain grain

dust, and already have training and maintenance programs to reduce the risks of

fires and explosions.

OSHA's Grain Handling Standard has been very successful. This has been

acknowledged by both OSHA and the industry. Explosions and fires have been

significantly reduced as a result of the standard and industry's related efforts. That

success, for example, was explicitly cited by OSHA in its Dust ANPR. The

industry wants to continue to work with OSHA to make their facilities safer.

Unfortunately, the inclusion of the undefined term "combustible dust" in the

Final Rule and the Rule's apparent application to the grain handling industry

threaten the success that the industry has already achieved. All of the facilities that

are already covered by and complying with the Grain Handling Standard are now

confused by the application and requirements of the Final Rule. "Combustible

dust" is undefined in the Final Rule, but "fugitive dust" is defined in the Grain

Handling Standard. Every "downstream" user of grain dust is already aware of

and dealing with the risks of excess dust, and are only being confused about how

the new requirements of the Final Rule apply on top of the Grain Handling

Standard. Had there been an adequate notice of intent in the proposed rulemaking,

18

this could have been explained to OSHA, and OSHA and the grain handling

industry would have had an opportunity in the Final Rule to make sure that the rule

did not threaten to undermine the success that has already been achieved.  No

additional users of grain will be informed of anything noteworthy, because they

already have knowledge of the implications of dust.  All of these issues could have

been addressed had there been adequate notice of proposed rulemaking, and a

carefully established definition of "combustible dust."

But in 2012, OSHA promulgated the Final Rule by amending the HCS to

include combustible dust in the workplace under the definition of "hazardous

chemical."  By making combustible dust a hazardous chemical in the Final Rule,

OSHA made combustible dust subject to an assortment of employee training,

hazard classification, product labeling and MSDS requirements that had been

reserved for hazardous chemicals under the HCS.  *See generally* 59 Fed. Reg. 6126

(Feb. 9, 1994) (J.A. __).

In amending the HCS in this way, OSHA made a critical error.  Despite the

obvious importance of the term "combustible dust," OSHA failed to define the

term in the Final Rule.  The Petitioners and Intervenor and OSHA agree that not all

workplace dusts are combustible.  *See* Final Rule, 77 Fed. Reg. at 17,705 ("OSHA

believes that … all dusts in the workplace are not combustible, and processing of

them does not always result in combustible atmospheres.") (J.A. __).  Moreover,

19

the determination of combustible dust raises complicated, scientific issues; OSHA

itself has explained that there are over a dozen factors – relating to both the dust

itself (*e.g.*, particle size), as well as the workplace conditions under which the dust

is created (*e.g.*, ignition source) – that determine whether a particular dust is

combustible.  Dust ANPR, 74 Fed. Reg. at 54,341 (J.A. __).  Indeed, the

complexity of combustible dust led OSHA, more than four years ago, to issue its

Dust ANPR in order to define the term and reconcile the numerous and

inconsistent voluntary standards that have attempted to address combustible dust

with "a single, comprehensive standard."  *Id*.

It is inappropriate for OSHA to attempt regulation without defining the key

term – "combustible dust" – that it is attempting to regulate.  How is the regulated

community on fair notice of the manner in which it is to conduct its business when

the standard against which it is to be judged is undefined?  OSHA's failure to

define "combustible dust" in the Final Rule is particularly egregious, because it

comes in the context of a separate OSHA rulemaking that, after appropriate input

from the regulated community and all other interested parties, will define

"combustible dust."  It is not appropriate for OSHA to prejudge the outcome of

that separate rulemaking by forcing on the regulated community now an undefined

standard.

OSHA responds to its failure to define "combustible dust" in the Final Rule

20

by pointing the regulated community to several voluntary standards and other references that define or otherwise relate to combustible dust. However, these definitions have not gone through OSHA's rulemaking process. Moreover, they are inconsistent and confusing. For example, in one discussion alone, OSHA refers to 11 different combustible dust definitions using three different descriptions of dust particle size – just one of many factors that determine whether a dust is combustible. Inconsistent and confusing standards that have not been subject to rulemaking do not constitute fair notice to the regulated community, especially when there is a separate, ongoing OSHA rulemaking that is specifically designed to reconcile those standards in the context of actually defining "combustible dust."

OSHA's failure to define "combustible dust" in the Final Rule is particularly injurious to and burdensome on the grain handling industry. The Petitioners' and Intervenor's members perform work with grain and other agricultural products that create dust, and may create a co-product that could be deemed "combustible dust," depending on how that term is defined. Thus, the Petitioners' and Intervenor's members are potentially subject to regulation under the Final Rule. Petitioners' and Intervenor's members must choose to either incur significant costs and administrative burdens to ensure compliance with a rule without a definition of "combustible dust," that may not even apply to them, or risk violating the Final Rule and, thereby, subject themselves to the risk of enforcement and sanctions.

Hammer Decl. ¶ 8 (Addendum A-13); Bode Decl. ¶ 8 (Addendum A-10); Gordon

Decl. ¶ 8 (Addendum A-12); Newman Decl. ¶8 (Addendum A-15).

Before the Final Rule, OSHA never gave the grain handling industry any

reason to believe that *combustible dust* from grain dust was regulated under the

HCS.  Grain was not mentioned anywhere in the HazCom ANPR, nor was

combustible dust.  OSHA did not so much as mention grain or the grain handling

industry in its solicitation for comments on the Proposed Rule or give any

indication that it intended to regulate combustible dust from grain in the Final

Rule.  *See generally* 74 Fed. Reg. 50,280 (Sept. 30, 2009) (J.A.  ___).  "Grain dust"

*was* included in the HCS, but primarily in the context of inhalation hazards from

wheat, oat and barley.  And, to be sure, OSHA explained in the HCS that it

expected MSDSs for those specific grains to state the permissible exposure levels

for the inhalation of dust from these grains.  59 Fed. Reg. at 6154 (J.A.  ___).  But,

there is no similar mandate regarding combustible dust from grain dust.  Indeed,

Petitioners and Intervenor are unaware of OSHA applying the HCS in the

enforcement context to combustible dust from grain dust.  Hammer Decl. ¶ 8

(Addendum A-13); Bode Decl. ¶ 8 (Addendum A-10); Gordon Decl. ¶ 8

(Addendum A-12); Newman Decl. ¶ 8 (Addendum A-15).

Moreover, in 1987, OSHA promulgated the Grain Handling Standard, which

provides "requirements for the control of grain dust fires and explosions," 52 Fed.

Reg. at 49,625 (J.A. ___), and the grain handling industry has been operating under that standard ever since. And, as mentioned, OSHA has a separate, ongoing rulemaking on combustible dust that is specifically focused on defining that term and reconciling the inconsistent voluntary standards and other references that currently exist. *See generally* 74 Fed. Reg. 54,334 (Oct. 21, 2009) (J.A. ___). OSHA led Petitioners' and Intervenor's members to believe that the combustible dust rulemaking, in conjunction with the Grain Handling Standard, not the Final Rule, would be the vehicle through which OSHA would develop a definition for "combustible dust" and for determining whether the products of the associations' members met that definition. Hammer Decl. ¶ 5 (Addendum A-13); Bode Decl.¶ 5 (Addendum A-10); Gordon Decl. ¶ 5 (Addendum A-12); Newman Decl. ¶ 5 (Addendum A-15).

Under the totality of all of these circumstances, the Final Rule's inclusion of "combustible dust" and OSHA's apparent intent to apply the provisions of the Final Rule to combustible dust from grain dust represent a major sea change in OSHA's enforcement policy as to the grain handling industry. This shift was done without appropriate notice and opportunity to comment by the grain handling industry members, without fair notice to them of what conduct is to be regulated, without substantial evidence in support of the Agency's action, and without an economic or technological feasibility analysis. Consequently, OSHA has violated

23

the OSH Act, Due Process Clause and the APA.

With respect to the OSH Act, Section 6(f) provides that "the determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole." 29 U.S.C. § 655(f) (Addendum A-3). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. OSHA*, 965 F.2d 962, 970 (11th Cir. 1992) (citations omitted). Moreover, OSHA's reference to the findings of voluntary organizations (like NFPA) does not relieve OSHA of the responsibility for making its own detailed findings, with adequate explanation and based on the "best available evidence," for all statutory criteria. *Id.* at 984.

It is self-evident that because the critical term "combustible dust" is not even defined in the Final Rule, OSHA has not supplied the requisite substantial evidence to support the use of that term in the Final Rule. Similarly, because OSHA has attempted to compensate for the Final Rule's failure to define "combustible dust" by referencing a series of voluntary standards, other references and confusing "guidance" documents, none of which have passed through formal rulemaking, the inclusion of "combustible" dust fails the rigor of the OSH Act's requirements of "substantial evidence" and detailed findings based on the "best available evidence."

24

OSHA has also violated the Due Process Clause. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (citing *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). Moreover, "laws must provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Final Rule fails both of these Due Process requirements. First, by promulgating the Final Rule without defining the key term "combustible dust," OSHA has promulgated a standard that does not provide fair notice to the Petitioners' and Intervenor's members of what conduct is expected of them. They do not know if they are subject to the Final Rule's training requirements that went into effect on December 1, 2013, and, in the absence of a definition of "combustible dust," do not have fair notice of the measure against which they can determine if their products could create combustible dust and are, therefore, subject to the additional requirements of the Final Rule. Indeed, in the context of an ongoing OSHA rulemaking specifically designated to analyze all of the factors that relate to combustible dust and expressly define that term, it is reasonable for the Petitioners and Intervenor and their members to believe that the combustible dust rulemaking, not the Final Rule, would be OSHA's mechanism for regulating combustible dust from grain.

Second, the enforcement dilemma caused by the absence of a definition for "combustible dust" is also a compelling basis to find the Final Rule to be void for vagueness under the Due Process Clause. Without a definition of "combustible dust" that has passed through appropriate rulemaking, it is impossible for the enforcement community to determinate whether the requirements of the Final Rule that flow from combustible dust are in fact in play.

Moreover, OSHA has violated the APA by depriving interested parties of a reasonable opportunity to participate in the rulemaking process. For the reasons discussed above, the grain handling industry did not comment on the development of the Final Rule because OSHA provided no indication that the Final Rule would affect the grain handling industry. To pass muster under the APA, notice-and-comment rulemaking must be clear and definitive. It must apprise all interested parties that their rights and obligations could be changed by the resulting regulation. OSHA failed entirely to provide such notice to the grain handling industry, thereby violating the APA's notice-and-comment rulemaking requirements.[6]

After promulgation of the Final Rule, OSHA issued "guidance" intended to clarify how to determine precisely what materials and products constitute

---

[6] In contrast, the Dust ANPR clearly evidenced its relevance to the grain handling industry, and the latter has been actively involved in submitting comments. *See* Statement of Facts *supra* at 15-17.

26

combustible dust regulated by the Final Rule. But said "guidance" is just as vague as the Final Rule, does nothing to inform the grain handling industry that combustible dust from grain dust could be covered by the regulation, and does nothing to cure the defect in OSHA's rulemaking.

Based on these violations of the OSH Act, Due Process Clause and APA, the Petitioners and Intervenor respectfully request that the Court vacate the combustible dust-related provisions of the Final Rule.

## STANDING

As noted, the Petitioners and Intervenor collectively represent thousands of businesses involved in the storage, use, processing and shipment of grain and other agricultural products, or some combination of these. Members of each association perform work with grain and other agricultural products that create dust and, depending on how "combustible dust" is defined, are potentially subject to regulation under the Final Rule. However, OSHA's failure to define "combustible dust" in the Final Rule has created a great deal of confusion and uncertainty among the Petitioners' and Intervenor's members regarding whether they are subject to the Final Rule. Indeed, because the training requirements in the Final Rule have already gone into effect, these members have already been harmed by OSHA's inclusion of combustible dust as a regulated, but undefined, substance. That injury will continue to be exacerbated in the months and years ahead. Accordingly,

27

Petitioners and Intervenor have standing to bring this action.

**Article III Standing**

Under Article III of the Constitution of the United States, an association has standing to sue on behalf of its members when

> (1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit.

*Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977)). For an association to establish that at least one of its members would have standing to sue in the member's own right, it must show that the member has (1) injury-in-fact, (2) causation, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Petitioners and Intervenor satisfy these requirements. As set forth in their declarations, Petitioners and Intervenor are associations comprising numerous companies engaged in various aspects of the grain handling industry and are operated for the purpose of promoting the commercial, professional, legislative, and other interests of their membership. Hammer Decl. ¶ 2 (Addendum A-13); Bode Decl. ¶ 2 (Addendum A-10); Gordon Decl. ¶ 2 (Addendum A-12); Newman Decl. ¶ 2 (Addendum A-15).

OSHA's failure to define "combustible dust" in the Final Rule has left Petitioners' and Intervenor's members unable to ascertain whether they are subject to the Final Rule or how to go about making that determination. Hammer Decl. ¶¶ 4-5 (Addendum A-13); Bode Decl. ¶¶ 4-5 (Addendum A-10); Gordon Decl. ¶¶ 4-5 (Addendum A-12); Newman Decl. ¶¶ 4-5 (Addendum A-15); Rowe Decl. ¶¶ 4-5 (Addendum A-16); Moore Decl. ¶¶ 4-5 (Addendum A-14); Flynn Decl. ¶¶ 4-5 (Addendum A-11). OSHA admits that there is no universally accepted definition for "combustible dust" and that even among standards promulgated by the same standards-developing organizations "the definitions may vary significantly." *Id.*; *see also* Statement of Facts *supra* at 16. OSHA attempted neither to define the term in its Notice of Proposed Rulemaking nor to solicit comments on a definition. Hammer Decl. ¶ 4 (Addendum A-13); Bode Decl. ¶ 4 (Addendum A-10); Gordon Decl. ¶ 4 (Addendum A-12); Newman Decl. ¶ 4 (Addendum A-15); Rowe Decl. ¶ 4 (Addendum A-16); Moore Decl. ¶ 4 (Addendum A-14). Nor did it make any definitional effort in the Final Rule. *Id*.

The Petitioners and Intervenor are unaware of OSHA having ever enforced the HCS against its members or any other company in the grain handling industry for alleged violations involving combustible dust from grain dusts, leading the industry members to reasonably conclude that they were not covered by the HCS, at least until adoption of the Final Rule. Hammer Decl. ¶ 7 (Addendum A-13);

29

Bode Decl. ¶ 7 (Addendum A-10); Gordon Decl. ¶ 7 (Addendum A-12); Newman

Decl. ¶ 7 (Addendum A-15); Rowe Decl. ¶ 8 (Addendum A-16); Moore Decl. ¶ 8

(Addendum A-14).  Now, because "combustible dust" is not defined in the Final

Rule, it is impossible for the Petitioners' and Intervenor's members to determine

which, if any, of their products are regulated by the Final Rule.  Absent

preenforcement review of the Final Rule, Petitioners' and Intervenor's members

must choose to either incur costs and administrative burdens to ensure compliance

with a rule that may not even apply to them or risk violating the Final Rule and,

thereby, subject themselves to the risk of enforcement and sanctions.  Hammer

Decl. ¶ 8 (Addendum A-13); Bode Decl. ¶ 8 (Addendum A-10); Gordon Decl. ¶ 8

(Addendum A-12); Newman Decl. ¶ 8 (Addendum A-15); Rowe Decl. ¶¶ 8-9

(Addendum A-16); Moore Decl. ¶¶ 8-9 (Addendum A-14); Flynn Decl. ¶¶ 8-9

(Addendum A-11).

For example, members do not know whether they should have provided

training on the Final Rule, which OSHA required regulated entities to have

completed by December 1, 2013.  Rowe Decl ¶ 6 (Addendum A-16); Moore Decl.

¶ 6 (Addendum A-14); Flynn Decl. ¶ 6 (Addendum A-11).  Also, any attempt to

comply with the Final Rule requires members to determine whether any of their

products could create an undefined combustible dust hazard downstream, the

conditions that could create such a hazard, and what their responsibilities are with

30

regards to such products under the Final Rule.  Rowe Decl. ¶ 7 (Addendum A-16);

Moore Decl. ¶ 7 (Addendum A-14); Flynn Decl. ¶ 7 (Addendum A-11).

Furthermore, members must determine whether the Final Rule requires them to

develop Safety Data Sheets, labeling as to their products, comply with a litany of

additional requirements under the Final Rule, or some combination of these.  *Id*.  In

short, the inclusion of "combustible dust" as an undefined term in the Final Rule

has led to substantial confusion among Petitioners' and Intervenor's members and

had an immediate impact on their ability to make a number of critical business

decisions.

        This Court has found "sufficiently concrete and particularized injury in fact"

where, as the Petitioners' and Intervenor's members have done here, the petitioner

has demonstrated that an administrative rule will have an "immediate impact" on

its "ability to make business decisions."  *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d

1113, 1117 (D.C. Cir. 2005); *see also Stilwell v. Office of Thrift Supervision*, 569

F.3d 514, 518-519 (D.C. Cir. 2009) (where final rule was substantially likely to

cause petitioner immediate economic harm and limit its ability to make certain

business decisions, petitioner had standing to challenge the final rule).  In *Sabre*,

the Department of Transportation ("DOT") asserted that the petitioner, the operator

of a computer reservation system, lacked Article III standing because it could not

demonstrate actual injury or that the as-yet-unenforced rule had restricted

31

petitioner's business operations.  The Court held that the petitioner had Article III

standing because petitioner's business decisions were already being affected by a

combination of three factors: (1) the final rule included provisions that could affect

the petitioner's business; (2) it appeared likely that DOT would take action against

the petitioner if it failed to comply with the rule; and (3) DOT had statutory

authority to impose penalties for violations of the rule.  429 F.3d at 1117-1119.

As discussed above, OSHA's inclusion of the undefined term "combustible

dust" in the Final Rule could have a significant impact on the business of

Petitioners' and Intervenor's members.  These members have every reason to

anticipate that OSHA may commence an enforcement action against them if they

fail to fully comply with the Final Rule.  *See*, *e.g.*, Discussion Regarding Standard

Interpretation, Argument Section I, *infra* at 43-44.

Moreover, should OSHA find that an employer has failed to comply with

any part of the Final Rule, it may issue a citation for each alleged offense.  29

U.S.C. § 659(a) (Addendum A-4).  OSHA may assess penalties between $5,000

and $70,000 for each alleged offense, depending upon its perceived severity, and

may even impose criminal sanctions in certain circumstances.  29 U.S.C. § 666(a)

– (c), (e) (Addendum A-5).

Like the petitioner in *Sabre*, Petitioners' and Intervenor's members face a

Final Rule which could dramatically impact their businesses, the likelihood that a

32

federal agency will enforce that Final Rule against them, cite them for any

perceived failures to comply with the Final Rule, and subject them to civil and

possibly even criminal sanctions.  These members are making business decisions

based on this combination of factors now.  Because the Final Rule has had and will

continue to have an immediate impact on the business decisions of Petitioners' and

Intervenor's members, Petitioners and Intervenor have Article III standing to bring

this action.

**Prudential Standing**

When an association sues under the Administrative Procedure Act ("APA"),

it must pass an additional test to establish standing.  Namely, the association must

prove that it has prudential standing – that is, that the interests it asserts are

arguably within the zone of interests to be protected or regulated by the statute that

it challenges.  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v.*

*Patchak*, 132 S. Ct. 2199, 2210 (2012) (citation omitted).

The APA "provides judicial review to any 'person suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action

within the meaning of a relevant statute.'"  *Webster v. Doe*, 486 U.S. 592, 597

(1988) (quoting 5 U.S.C. § 702)).  Courts apply the test for prudential standing in

keeping with Congress' evident intent when enacting the APA to "'make agency

action presumptively reviewable.'"  *Patchak*, 132 S. Ct. at 2210 (quoting *Clarke v.*

33

*Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).  Accordingly, the test is not

particularly demanding.  *Patchak,*132 S. Ct. at 2210.  No indication of

Congressional intent to benefit the petitioner is required and the petitioner receives

the benefit of any doubt.  *Id*.  The test forecloses standing only when the

petitioner's

> interests are so marginally related to or inconsistent with the purposes
> implicit in the statute that it cannot be reasonably assumed that
> Congress intended to permit the suit.

*Id*. (quoting *Clarke*, 479 U.S. at 399).

The OSH Act empowers the Secretary of Labor to create or modify health or

safety standards through notice-and-comment rulemaking.  29 U.S.C. § 655(b)(1) –

(5) (Addendum A-3).  Any person who may be adversely affected by any such

standard may file a petition challenging its validity with the appropriate United

States court of appeals.  29 U.S.C. § 655(f) (Addendum A-3).

Petitioners and Intervenor challenge, among other things, OSHA's

amendment of the Final Rule to include "combustible dust" as a regulated

substance without providing adequate notice that it was to be included in the Final

Rule and without a useful definition of the term's meaning.  As described above,

Petitioners' and Intervenor's members have already been adversely affected by

OSHA's actions in promulgating the Final Rule and are likely to incur additional

injury absent intervention by this Court.  Their interests are being directly affected

by a rule promulgated under the OSH Act.  The Petitioners and Intervenor, therefore, also have prudential standing to bring this case.  *See, e.g.*, *Clarke*, 479 U.S. at 402-03 (trade association representing securities brokers, among others, had prudential standing to challenge Comptroller of Currency's approval of bank's application to offer discount brokerage services at locations inside and outside of its home state; the association's interest had plausible relationship to National Bank Act's policy of keeping national banks from gaining monopoly control through unlimited branching); *Sabre*, 429 F.3d at 1118-19 (operator of independent computer reservation system had prudential standing to challenge DOT's finding that it was subject to agency's regulatory authority, even though no agency regulations currently affected operator's business activities).

Pursuant to *Sierra Club*, 292 F.3d at 900, D.C. Cir. Rule 28(a)(7), and the Court's Scheduling Order, the Petitioners and Intervenor have included declarations establishing their standing in the Addendum to this Brief.

## STANDARD OF REVIEW

### The Administrative Procedure Act

An agency's action in promulgating standards under the Administrative Procedure Act ("APA") may be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Motor Vehicle Mnfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983) (citation

omitted).  Review under the "arbitrary and capricious" standard is narrow and the court may not substitute its judgment for that of the agency.  *Id*. at 43.

The agency must, nonetheless, demonstrate that it has examined the relevant data and articulate a satisfactory explanation for its action "including a 'rational connection between the facts found and the choice made.'"  *Id*. (citation omitted). Where an agency has failed to consider factors relevant to its inquiry or has relied on impermissible factors, or where the agency has committed a "clear error of judgment," the court must undo its action.  *Id*. (citation omitted).

## The OSH Act

The OSH Act incorporates the "substantial evidence" test for judicial review.  29 U.S.C. § 655(f). (Addendum A-3).  "Substantial evidence is such relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion."  *Am. Fed'n of Labor*, 965 F.2d at 970 (quoting *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 522 (1981) (internal quotations omitted)).  The test requires the reviewing court to "take a 'harder look' at OSHA's action" than it would under the more deferential "arbitrary and capricious" standard.  *Id*. (citation omitted).

Specifically, the Court must "ensure that the agency has:  (1) acted within the scope of its authority; (2) followed the procedures required by the statute and by its own regulations; (3) explicated the bases for its decision; and (4) adduced

36

substantial evidence in the record to support its determinations." *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1206 (D.C. Cir. 1980) (quoting *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Marshall*, 617 F.2d 636, 650 (1979), *aff'd in part*, *rev'd in part on other grounds*, *Textiles Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490 (1981)).

When the court reviews OSHA's rulemaking, "OSHA must demonstrate substantial evidence for all matters of determinable fact and, must explain the relevant considerations on which it relied and its reasons for rejecting alternate views." *Am. Fed'n of Labor*, 965 F.2d at 970. The agency's policy decisions must be both consistent with the language and purpose of the OSH Act and reasonable under the rulemaking record. *Id*.

**<u>The Due Process Clause of the United States Constitution</u>**

In reviewing a regulation for constitutional vagueness, the Court must determine whether the promulgating agency defined the rule's application in a comprehensible manner. *Throckmorton v. NTSB*, 963 F.2d 441, 444 (D.C. Cir. 1992) (citing *Vandehoef v. NTSB*, 850 F.2d 629, 630 (10th Cir. 1988)). The level of scrutiny to be applied varies depending on the nature of the regulation. *Id*.

Regulations that authorize civil penalties create a prohibitory effect that is quasi-criminal, warranting relatively strict scrutiny. *See Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 508 (5th Cir. 2001). For such regulations to

37

withstand judicial review, they must define offenses "with sufficient definiteness

that ordinary people can understand what conduct is prohibited and in a manner

that does not encourage arbitrary and discriminatory enforcement." *Id*. (quoting

*United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991).

## ARGUMENT

**I.    OSHA Violated the APA by Failing to Provide Appropriate Notice and Opportunity for Comment to the Grain Handling Industry.**

The APA requires OSHA, during a proposed rulemaking, to provide notice

that effectively provides "interested parties a reasonable opportunity to participate

in the rulemaking process." *MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1140

(D.C. Cir. 1995) (quoting *Florida Power & Light Co. v. United States*, 846 F.2d

765, 771 (D.C. Cir. 1988)).  Notice requirements are designed

> (1) to ensure that agency regulations are tested via exposure to diverse
> public comment, (2) to ensure fairness to affected parties, and (3) to
> give affected parties an opportunity to develop evidence in the record
> to support their objections to the rule and thereby enhance the quality
> of judicial review.

*Int'l Union, UMWA v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C.

Cir. 2005) (citing *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d

506, 547 (D.C. Cir. 1983)).

OSHA has acted in an arbitrary and capricious manner by depriving the

grain handling industry of sufficient notice to afford it a reasonable opportunity to

participate in the rulemaking process for the Final Rule.  The ANPR lacked any

reference to grain or to "combustible dust" whatsoever. *See generally* HazCom

ANPR, 71 Fed. Reg. 53,617 (Sept. 12, 2006) (J.A. ___).  And, the HazCom ANPR

did not solicit comments from the grain handling industry in its requests for

comments. *Id.* (J.A. ___).

The Proposed Rule introduced the concept of including "combustible dust"

in the Final Rule, but did not give any indication that OSHA intended to regulate

combustible dust from grain dust in the Final Rule. *See generally* 74 Fed. Reg.

50,280 (Sept. 30, 2009) (J.A. ___).  Rather, the only mention of grain in the

Proposed Rule was in the proposed language for the Final Rule, which was the

same language that had been used in the grain labeling provision under the HCS

for many years. *Id.* at 50,441 (J.A. ___). *Compare* 29 C.F.R. § 1910.1200(f)(2)(i-

ii) (1994) (Addendum A-8) *with* 74 Fed. Reg. at 50,441 (J.A. ___) ("For ...

shipments of *whole grain*, the required label may be transmitted to the customer at

the time of the initial shipment, and need not be included with subsequent

shipments to the same employer unless the information on the label changes; [t]he

label may be transmitted with the initial shipment itself, or with the [material]

safety data sheet that is to be provided prior to or at the time of the first

shipment.") (emphasis added).

But that language was not specific to combustible dust and did not even

mention combustible dust.  *See* 29 C.F.R. § 1910.1200(f)(2)(i-ii) (1994)

(Addendum A-8). Indeed, the preamble to the HCS suggests that it is respiratory distress from inhalation of certain grain dust with which OSHA was concerned when it included the grain labeling provisions. The preamble includes an extensive discussion of the possible respiratory effects from inhalation of certain grain dust and the need to inform employers and employees of the PELs for the inhalation of grain dust. 59 Fed. Reg. at 6154-55 (J.A. ___).

For example, OSHA referred to the ACGIH TLV (that is, the value established by a health and safety standards-setting organization for PELs for various substances) for grain dust and said that the TLV should be included in the MSDSs for regulated grains. *Id.* at 6154 (J.A. __), *see also* Subpart Z of the HCS (establishing PELs for oat, wheat and barley) (Addendum A-7). There is no similar commentary or mandate regarding combustible dust from grain dust. *See generally* 59 Fed. Reg. 6126 (J.A. __).

Because grain dust has been regulated by the Grain Handling Standard since 1987 and was never regulated as combustible by the HCS, the grain handling industry had no notice or reason to suspect that it might be subject to the combustible dust provisions of the Final Rule. *See generally* 59 Fed. Reg. 6126 (Feb. 9, 1994) (J.A. __) (combustible dust from grain dust not included in the HCS); 52 Fed. Reg. 49,592, 49,625 (Dec. 31, 1987) (J.A. __) (Grain Handling Standard provides "requirements for the control of grain dust fires and

40

explosions"). There was absolutely no indication in the rulemaking for the Final

Rule that the grain handling industry might be affected by it.

Rulemaking must be "clear and to the point." *McLouth Steel Prods. Corp. v.*

*Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988) (citing *Am. Iron & Steel Inst. v.*

*EPA*, 568 F.2d 284, 291-92 (3d Cir. 1977) (invalidating application of rule to the

specialty steel industry where rulemaking gave no indication that the agency

intended to regulate that industry); *Wagner Electric Corp. v. Volpe*, 466 F.2d 1013,

1019 (3d Cir. 1972) (notice inadequate where only certain affected industries

commented during the rulemaking process, because others were unaware that the

rule might apply to them). It must put every industry that could be affected by the

rulemaking on notice -- this is true even if some industries have provided

comments regarding the provisions in question. *Wagner*, 466 F.2d at 1019. In

fact, the "absence of comment from [potentially affected] groups may well be

because the notice of proposed rulemaking never advised [them] of this subject or

issue." *Id*. at 1019-20.

Moreover, the grain handling industry had no notice or reason to suspect that

it might be subject to the Final Rule's attempt to regulate combustible dust from

grain dust by requiring Safety Data Sheets and labeling to be provided to

downstream customers. OSHA appears to justify its downstream regulation of

combustible dust from grain dust in the Final Rule by claiming that the HCS has

always provided for this and that, therefore, the Final Rule presented no surprises. 74 Fed. Reg. at 50,395. However, this is not true. As noted earlier (*see* Statement of Facts *supra* at 8-9), 29 C.F.R. § 1910.1200(d)(1) (1994), the provision cited by OSHA for support of its downstream claim, did not require an analysis of hazards associated with downstream uses of a product.

Additionally, in the Final Rule, OSHA noted that the U.S. Chemical Safety Board ("CSB")[7] recommended that OSHA amend the HCS to explicitly address the fire and explosion hazards of combustible dusts, and "*require* inclusion of dust fires and explosions among the physical hazards that must be addressed in Material Safety Data Sheets." 77 Fed. Reg. at 17,704 (emphasis added) (J.A. ___). Based on this recommendation, it is clear that the CSB did not believe that the HCS applied to downstream notice of potential fire and explosion hazards, including those from combustible dusts. If the CSB, another federal agency, did not believe the HCS applied to downstream fire and explosion hazards, including those from combustible dusts, how could the regulated community have been on notice that the HCS applied to these potential downstream hazards? Under these circumstances, OSHA simply cannot reasonably claim that the Final Rule

---

[7] The CSB is an independent federal agency charged with investigating industrial chemical accidents and making recommendations, including to regulatory agencies such as OSHA, regarding actions that should be taken to prevent similar accidents from occurring in the future. *See* U.S. Chemical Safety Board, Mission, *available at* http://www.csb.gov/about-the-csb/mission/ (J.A. ___).

presented no surprises to the grain handling industry as to the downstream

regulation of combustible dusts.

In the absence of a definition for "combustible dust," OSHA has issued

"guidance" to its compliance officers for determining what constitutes

"combustible dust" under the Final Rule.  Standard Interpretation (J.A. __).

Compliance officers were instructed to refer to some of OSHA's own rules, such

as the Grain Handling Standard, and 10 different industry consensus standards

published by three different organizations in order to determine whether a material

is "combustible dust" regulated by the Final Rule.  *Id*.

Moreover, the Standard Interpretation states that:

> This memorandum provides guidance for compliance safety and
> health officers (CSHOs) to use in determining whether manufacturers
> or importers have properly classified their products for combustible
> dust hazards under the *revised* Hazard Communication Standard
> (HCS).  This guidance shall be used when inspecting manufacturers
> and importers, usually from referrals concerning inadequate or
> inappropriate labels or SDSs are conducted, not inspection of
> downstream uses.  Until OSHA *addresses these issues through
> rulemaking*, CSHOs *shall* use this document to determine ...
> compliance with the obligations of 1910.1200(d) *for combustible
> dust*."

*Id*. (emphasis added) (citation omitted).

This "guidance" is so confusing that it is practically indecipherable -- it

could easily be interpreted as instructing enforcement *now* for provisions of

the Final Rule that do not go into effect until 2015 or 2016, instructing that

some further undefined rulemaking is necessary to interpret the combustible

dust provisions of the Final Rule, or both.

Such "guidance" is insufficient to save OSHA's flawed rulemaking.  A

substantive regulation must have "sufficient content and definitiveness as to be a

meaningful exercise in agency lawmaking." *Paralyzed Veterans of Am. v. D.C.*

*Arena L.P.*, 117 F.3d 579, 584 (D.C. Cir. 1997).  It is certainly not open to an

agency to "promulgate mush" and then attempt to give it form only through

subsequent, less formal, and in this case, equally imprecise "interpretations."  That

technique "would circumvent section 553, the notice and comment procedures of

the APA."  *Id*.

**II.    OSHA's Inclusion of Combustible Dust from Grain Dust in the Final
Rule as  a Hazardous Chemical Is Not a Logical Outgrowth of the
Notice of Proposed Rulemaking's General Proposal to Include
"Combustible Dust" as a Regulated Substance.**

The APA requires an agency conducting notice-and-comment rulemaking to

publish in its notice of proposed rulemaking "either the terms or substance of the

proposed rule or a description of the subjects and issues involved."  5 U.S.C. §

553(b)(3) (Addendum A-2).  The terms and substance in the notice of proposed

rulemaking and the final rule need not be identical, but an agency's final rule must

be a "logical outgrowth" of its notice.  *Ass'n of Private Sector Colls. & Univs. v.*

*Duncan*, 681 F.3d 427, 461 (D.C. Cir. 2012) (quoting *CSX Transp., Inc. v. Surface*

*Transp. Bd.*, 584 F.3d 1076 (D.C. Cir. 2009)).

44

A final rule qualifies as a logical outgrowth "if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Id.* (citation omitted). By contrast, a final rule fails the logical outgrowth test and, thus, violates the APA's notice requirement where "interested parties would have had to 'divine [the agency's] unspoken thoughts,' because the final rule was surprisingly distant from the proposed rule." *Id.*

The Final Rule was not a logical outgrowth of OSHA's NPRM. As set forth above, the text of the NPRM treated grain the same way that grain had always been treated under the HCS. That is, grain was subject to some labeling requirements under the Final Rule as it always had been under the HCS. There is no further mention of grain in the NPRM or any indication that OSHA intended to regulate combustible dust from grain dust in the Final Rule. *See generally* 74 Fed. Reg. 50,280 (Sept. 30, 2009) (J.A. ___). Nor did OSHA solicit comments on this possibility. *Id.* The identical singular reference to grain used in both the HCS and the NPRM seemed to indicate that the Final Rule, as the HCS before it, would regulate potential hazards related to inhalation of certain grain dusts -- and nothing more.

The Final Rule, however, announced OSHA's intent to regulate grain in an entirely new and unanticipated way. OSHA declared that combustible dust from

45

grain dust – a substance historically, and successfully, regulated by the Grain

Handling Standard – would henceforth be regulated by the Final Rule as well.  77

Fed. Reg. at 17,705-06 (J.A.  __).  OSHA reached this end by including

"combustible dust" (an undefined term) in the definition of hazardous chemicals

which are subject to *every provision* of the Final Rule.  *Id*. at 17,705 (J.A.  __).

And, it used grain dust as its preamble example of the type of product that could

constitute a "combustible dust" regulated by the Final Rule.  *Id*.  Specifically,

OSHA stated that

> grain ... does not present a combustible dust hazard in the shipped
> form.  But when processed downstream in a plant, such hazards are a
> concern, and the employer needs the label information to properly
> address the hazard in the workplace.[8]  Since this is a normal condition
> of use for the grain, the chemical manufacturer or importer must
> provide the information at the time of the initial shipment, and in the
> future if there is new information regarding the hazards or protective
> measures.  An SDS must always be provided.

*Id*.

OSHA's inclusion of combustible dust from grain dust as a hazardous

chemical under the Final Rule was an unforeseeable change of course.

Given the complete lack of discussion of combustible dust from grain dust

prior to the promulgation of the Final Rule, the grain handling industry

---

[8] Even the preamble language is confusing.  What constitutes "downstream
processing" and how is a grain elevator, for example, assuming it is a "chemical
manufacturer," to anticipate what downstream processing will occur with respect
to the grain it handles?

"would have had to 'divine' [OSHA's] unspoken thoughts" to be on notice

that it could be so affected by the Final Rule. *Duncan*, 681 F.3d at 461

(citation omitted). Accordingly, the Final Rule is not a logical outgrowth of

the NPRM and was promulgated in violation of the APA. *See id.* (the

Department of Education's final rule was not a logical outgrowth of the

notice of proposed rulemaking because the Department failed to point to

anything in its notice of proposed rulemaking specifying an intent to regulate

distance education, nor did it solicit comments to that effect); *Shell Oil Co.

v. EPA*, 950 F.2d 741, 758-59 (D.C. Cir. 1991) (agency's final rule was not a

logical outgrowth of the agency's notice).

**III.  "Combustible Dust" Should Be Defined and Addressed in a Coordinated Fashion Through the Specific OSHA Rulemaking That Was Designed to Deal With It, Not in the Final Rule Where It Is Not Even Defined; This Is Improper Rulemaking by the Agency.**

**A.  OSHA's Advance Notice of Proposed Rulemaking for Combustible Dust.**

Concerned that "[t]he existing regulatory regime [with respect to

combustible dust] is fragmented and incomplete" and that "existing OSHA

standards do not regulate important elements of combustible dust hazards," on

October 21, 2009, OSHA issued an ANPR for combustible dust. Dust ANPR, 74

Fed. Reg. at 54,340 (J.A. ___). The Dust ANPR opined that OSHA's Hazard

Communication Standard had been an ineffective vehicle for dealing with

47

combustible dust,[9] and that "a single, comprehensive standard addressing all of [the] hazards [for combustible dust] will likely provide clarity for employers and increased safety for exposed workers." *Id.* at 54,341 (J.A. __).  The purpose of the ANPR was to "use the information received in response to this notice in developing a proposed standard for combustible dust." *Id.* at 54,334 (J.A. __).

**B.    OSHA's Combustible Dust Rulemaking Will Address the Many Complex, Scientific Factors Involved in Defining "Combustible Dust."**

The Dust ANPR made it clear that defining "combustible dust" is a highly complex and scientific issue and that "[n]o single, universally accepted definition of combustible dust is available." *Id.* at 54,341 (J.A. __).  Further emphasizing the complexity of defining "combustible dust," OSHA explained the numerous factors – both product and non-product related – that determine whether a dust can be combustible.  These include:

- Size of particles
- Shape of particles
- Particle surface-area-to-volume ratio
- Agglomeration (how well particles stick together)
- Impurities present in the material
- Moisture content of the material
- The predisbursal dust layer depth and location
- The concentration of particles in a dust cloud

---

[9] "During its combustible dust study, [the U.S. Chemical Safety and Hazard Investigation Board ("CSB")] ... found that information regarding potential combustible dust hazards was poorly or inadequately transmitted to employers and workers ...." *Id.* at 54,342 (J.A. __).

48

- The spatial distribution of particles in a dust cloud (the variation in concentration throughout a dust cloud)
- Oxygen concentration
- Turbulence in the space or area
- Characteristics of the ignition source (including magnitude and level of energy)
- Location of the ignition source in relation to the dust cloud

*Id*. OSHA said that it needed to consider these factors and others "in developing a comprehensive standard for combustible dust." *Id*.

**C.    OSHA's Combustible Dust Rulemaking Will Address the Various and Inconsistent Definitions of "Combustible Dust" Developed by Standards-Developing Organizations.**

There have been numerous attempts by the National Fire Protection Association ("NFPA"), a private standards-developing organization, to define "combustible dust."  Also, in 2008, OSHA issued a Combustible Dust National Emphasis Program ("NEP"), which set forth a working definition of "combustible dust."  77 Fed. Reg. 17,705 (J.A. __).[10]  And, in 1987, OSHA promulgated the Grain Handling Standard, which did not define "combustible dust," but referenced it as part of OSHA's definition of "fugitive grain dust."  But, these standards and other references to "combustible dust" vary widely.  As noted above, the OSHA Dust ANPR explained that there are more than one dozen factors that must be considered in order to determine the combustibility of a dust.  For example, one of

---

[10] The NEP did not go through OSHA rulemaking.  OSHA develops NEPs to focus outreach efforts and inspections on specific defined hazards in the workplace.  OSHA's Field Operations Manual, CPL-02-00-150 (Apr. 22, 2011) (J.A. __).

those factors is "size of particle."  Dust ANPR, 74 Fed. Reg. at 54,341 (J.A.  __).

This factor has been variously described in the NFPA and prior OSHA references,

as follows:

- Any finely divided solid agricultural material 420 microns or smaller in diameter (material passing a U.S. No. 40 Standard Sieve) that presents a fire or explosion hazard when dispersed and ignited in air.

NFPA 61, Chapter 3, General Definitions, Definition of "Agricultural Dust" §

3.3.1 (J.A.  __).

- Dusts traditionally have been defined as a material 420 μm or smaller (capable of passing through a U.S. No. 40 standard sieve).  Other standards have adopted 500 μm (capable of passing through a U.S. No. 35 standard sieve) as the appropriate size criterion....  In some cases, material smaller than 420 μm might not be explosible, and in some cases material larger than 420 μm might be explosible.

NFPA 61, Annex A, Explanatory Material § A.3.3.1 (J.A.  __).

- Dusts traditionally were defined as material 420 μm or smaller (capable of  passing through a U.S. No. 40 standard sieve).  For consistency with other standards, 500 μm (capable of passing through a U.S. No. 35 standard sieve) is now considered an appropriate size criterion.

 NFPA 654, Annex A, Explanatory Material § A.3.3.5 (J.A.  __).

- A combustible particulate solid that presents a fire or deflagration hazard when suspended in air or some other oxidizing medium over a range of concentrations, regardless of particle size or shape.

Combustible Dust National Emphasis Program, Part VIII(B), definition of

"Combustible Dust" (J.A. __).

- Fugitive grain dust" means combustible dust particles, emitted from the stock handling system, of such size as will pass through a U.S. Standard 40 mesh sieve (425 microns or less).

Grain Handling Standard, 29 C.F.R. § 1910.272(c) (2014), definition of "Fugitive

grain dust."[11]  (Addendum A-6).

OSHA recognized that these standards are inconsistent and these

inconsistencies negatively impact the regulated community:

> [N]o one standard comprehensively addresses the hazards of combustible dust, which may pose difficulties for some employers trying to develop programs to mitigate combustible dust hazards.... Even among standards promulgated by the same standards-developing organization, the definitions vary significantly.  NFPA 654 and 655 define combustible dust in general terms without regard for particle size.  This approach recognizes that factors such as particle shape, agglomeration, and other characteristics listed earlier in this notice, can affect explosibility.  Other standards (such as NFPA 61, 484, and 664) define combustible dust in terms of a minimum particle size. The definition in previous editions of NFPA 654 (which may still be used in some areas of the country) was also size-based.

Dust ANPR, 74 Fed. Reg. at 54,339, 54,341 (J.A. __).  As a result of these

inconsistencies and their impact, OSHA said that one of the issues it would address

in its rulemaking on combustible dust was "whether and how to integrate current

---

[11] NFPA is currently working on NFPA 652, yet another voluntary combustible dust standard.  *See* NFPA 652 Standard Information – Proposed Standard on Combustible Dusts *available at* http://www.nfpa.org/codes-and-standards/document-information-pages?mode=code&code=652&tab=nextedition (J.A. __).

and future national consensus standards into a regulatory scheme." *Id*. at 54,341

(J.A. ___).

**D.    Status of OSHA's Combustible Dust Rulemaking.**

Evidencing the complexity of defining "combustible dust," OSHA has not

completed its rulemaking on combustible dust despite starting the rulemaking more

than four years ago.  As noted above, OSHA published the Dust ANPR on October

21, 2009.  OSHA conducted stakeholder meetings on December 14, 2009,

February 17, 2010, and April 21, 2010.  *See* 79 Fed. Reg. 1186, 1187 (Jan. 4, 2014)

J.A. __).  A webchat for combustible dust was held on June 28, 2010, and an

expert forum was convened on May 13, 2011.  *Id*.  OSHA recently announced that

it expects to initiate a feasibility review under the Small Business Regulatory

Enforcement Act of 1996 in April 2014.  See OSHA's Regulatory Agenda,

Combustible Dust, RIN 1218-AC41 (Fall 2013), *available at*

http://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201310&RIN=1218-

AC41 (J.A. __).  It is unknown when OSHA will issue its proposed rule on

combustible dust, conduct a comment period for the regulated community and

other interested persons to provide input, and issue a final rule.

E.    **OSHA Has Violated the OSH Act and the Due Process Clause by Failing to Define "Combustible Dust" in the Final Rule, and by Expecting The Regulated Community and Enforcement Authorities to Reconcile Inconsistent Voluntary Standards Regarding Combustible Dust for Purposes of Interpreting the Final Rule.**

1.    **OSHA Has Violated the OSH Act.**

Section 6(f) of the OSH Act provides that "[t]he determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole."  29 U.S.C. § 655(f) (Addendum A-3).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Am. Fed'n of Labor*, 965 F.2d at 970 (citations omitted).  The "substantial evidence" standard requires a "harder look" at OSHA's action than under the more deferential "arbitrary and capricious" standard.  *See, e.g.*, *Nat'l Grain & Feed Ass'n v. OSHA*, 866 F.2d 717, 728 (5th Cir. 1989).  "[I]n setting an element of the standard OSHA must demonstrate substantial evidence for all matters of determinable fact and, on matters having no possible basis in determinable fact, must explain the relevant considerations on which it relied and its reasons for rejecting alternate views."  *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1253 (D.C. Cir. 1980).  A court must "rigorously review the agency's interpretations of the substantive provisions of its statutory mandate" and "ensure that the agency has lived up to statutory and constitutional standards in its rulemaking procedure ...."  *Id.* at 1206.

53

Requiring OSHA to explain its standards in accordance with the substantial

evidence standard serves several purposes:

> Explicit explanation for the basis of the agency's decision not only facilitates
> proper judicial review but also provides the opportunity for effective peer
> review, legislative oversight, and public education.  This requirement is in
> the best interest of everyone, including the decision-makers themselves.  If
> the decision-making process is open and candid, it will inspire more
> confidence in those who are affected.  Further, by opening the process to
> public scrutiny and criticism, we reduce the risk that important information
> will be overlooked or ignored.

*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Marshall*, 617 F.2d 636, 651-52

(D.C. Cir. 1979), *aff'd in part, vacated in part*, *Am. Textile Mfrs. Inst., Inc. v.*

*Donovan*, 452 U.S. 490 (1980)).

Moreover, using the findings of a voluntary standards-setting organization

(like NFPA) does not:

> relieve OSHA of the responsibility for making detailed findings, with
> adequate explanation, for all statutory criteria....  As it is ultimately
> OSHA's responsibility to make those statutory findings, OSHA must
> determine, based on the best available evidence, 29 U.S.C.
> § 655(b)(5), if those statutory criteria have been met, and then set
> forth the analysis behind that determination in an understandable
> way.

*Am. Fed'n of Labor*, 965 F.2d at 984.

It is self-evident that because the critical term "combustible dust" is not even

defined in the Final Rule, OSHA has not supplied the requisite substantial evidence

to support the use of that term in the Final Rule.  Similarly, because OSHA has

attempted to compensate for the Final Rule's failure to define "combustible dust"

by reference to a series of voluntary standards, other references, and confusing

"guidance" documents, none of which have passed through formal rulemaking, the

inclusion of "combustible dust" fails the rigor of OSHA's "substantial evidence"

and "best available evidence" determinations.[12]  Indeed, weighing those voluntary

standards based on substantial evidence and the best available evidence

requirements is one of the purposes of the formal rulemaking for combustible dust

as announced in the ANPR.  In advance of that rulemaking, it is premature and

improper for OSHA to require the regulated community to use these standards in

an effort to comply with the undefined term "combustible dust" under the Final

Rule.

## 2.      OSHA Has Violated the Due Process Clause.

"A fundamental principle in our legal system is that laws which regulate

persons or entities must give fair notice of conduct that is forbidden or required."

*Fox Television Stations*, 132 S. Ct. at 2317 (citing *Connally v. Gen. Constr.*, 269

U.S. at 391).  Moreover, "laws must provide explicit standards for those who apply

them."  *Grayned*, 408 U.S. at 108.  *See also Fox Television Stations*, 132 S. Ct. at

---

[12] In addition, the voluntary standards have not undergone the required economic
and technological feasibility tests required of OSHA when promulgating a new
standard.  "OSHA standards must be both economically and technologically
feasible."  *Nat'l Maritime Safety Ass'n v. OSHA*, 649 F.3d 743, 752-753 (D.C. Cir.
2011) (citations omitted).

2317.[13]  ("[P]recision and guidance are necessary so that those enforcing the law

do not act in an arbitrary or discriminatory way.").

> Supreme Court precedent recognizes two independent grounds upon which a
> statute's language may be so vague as to deny due process of law.  First, a
> law violates due process "if it fails to provide people of ordinary intelligence
> a reasonable opportunity to understand what conduct it prohibits...."
> Second, a law is unconstitutionally vague "if it authorizes or even
> encourages arbitrary and discriminatory enforcement."

*Cunney v. Bd. of Trs.*, 660 F.3d 612, 620-21 (2d Cir. 2011) (citations omitted).

The Final Rule fails both of these Due Process requirements.  First, by

promulgating the Final Rule without defining a key term – "combustible dust" –

OSHA has promulgated a standard that does not provide fair notice to the

Petitioners' and Intervenor's members of what conduct is expected of them.  For

example, Petitioners' and Intervenor's members do not know whether they were

required to provide certain training to employees regarding the Final Rule, which

OSHA required regulated entities to have completed by December 1, 2013.  Rowe

Decl. ¶ 6 (Addendum A-16); Moore Decl. ¶ 6 (Addendum A-14); Flynn Decl. ¶ 6

(Addendum A-11).  Similarly, in the absence of a definition of "combustible dust,"

the Petitioners' and Intervenor's members are not on fair notice as to the measure

to use to determine if any of their products could create a combustible dust hazard

downstream, the conditions that could create such a hazard, and what their

---

[13] These requirements are just as applicable in the civil administrative context as
they are in the context of potential criminal liability.  *Gen. Elec. Co. v. EPA*, 53
F.3d 1324, 1329 (D.C. Cir. 1995) (citations omitted).

responsibilities are with respect to such products. Rowe Decl. ¶ 7 (Addendum A-16); Moore Decl. ¶ 7 (Addendum A-14); Flynn Decl. ¶ 7 (Addendum A-11). In the absence of a definition of "combustible dust" that has gone through appropriate rulemaking, due process cannot be satisfied. Indeed, in the context of an ongoing OSHA rulemaking specifically designed to analyze all of the factors that relate to combustible dust and expressly define that term, it is reasonable for the Petitioners and Intervenor and their members to believe that the combustible dust rulemaking, not the Final Rule, would be OSHA's mechanism for regulating combustible dust. *See, e.g.*, *Gen. Elec. Co.*, 53 F.3d at 1333-34 (EPA's application of a regulation barring unapproved means of disposal of PCBs to a pre-disposal distillation process was void for vagueness: "[w]here … the regulations and other policy statements are unclear, where the petitioner's interpretation is reasonable, and where the agency itself struggles to provide a definitive reading of the regulatory requirements, a regulated party is not 'on notice' of the agency's ultimate interpretation of the regulations, and may not be punished."); *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 155-56 (D.C. Cir. 1986) (confusing and unclear OSHA regulation requiring emergency breathing equipment was not "constitutionally adequate").

The enforcement dilemma caused by the absence of a definition for "combustible dust" is also a compelling basis to find the Final Rule to be void for

57

vagueness under the Due Process Clause.  Without a definition of "combustible dust" that has passed through appropriate rulemaking, it is impossible for the enforcement community to determine whether the requirements of the Final Rule that flow from combustible dust are in fact in play.

In an attempt to cure this flaw, on December 27, 2013, OSHA issued its Standard Interpretation for compliance safety and health officers.  Standard Interpretation.  But, as noted earlier, instead of promoting clarity, the Standard Interpretation provides imprecise, inconsistent and confusing enforcement directives.  As a further example, as to dust particle size, one of the many factors that are relevant to the definition of "combustible dust," OSHA's Standard Interpretation instructed its compliance safety and health officers:

**Dust Particle Size.**

For many years, NFPA 654 defined combustible dust as a "finely divided solid material 420 microns or smaller in diameter (material passing a U.S. No. 40 Standard Sieve) that presents a fire or explosion hazard when dispersed and ignited in air"....  Some NFPA standards still use a size criterion in defining combustible dust, such as NFPA 61 (2013) and NFPA 704 (2012).  Other NFPA standards, however, have changed their combustible dust definition to remove the size criterion....  If the material will burn and contains a sufficient concentration of particles 420 microns or smaller to create a fire or deflagration hazard, it should be classified as a combustible dust  A classifier may, if desired, instead use the 500 micron particle size (U.S. Sieve No. 35) threshold contained in more recent NFPA standards.  Care must be used with this approach where the particles are fibers or flakes, or where agglomerations of smaller particles may be held together by static charges or by other means that would prevent the dust from passing

58

through respective sieves No. 40 and 35, but would still present a fire or deflagration hazard.

Standard Interpretation (J.A. __).  The distinctions and inconsistencies in these particle size definitions are palpable.  Which voluntary standard's definition will compliance officers enforce?[14]  Because there is nothing to prevent the arbitrary and discriminatory enforcement of these varied and inconsistent definitions, the Final Rule is void for vagueness.  *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 169 (1972) (striking down anti-vagrancy laws granting police subjective and undue discretion in enforcement); *Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 1007 (D.C. Cir. 2013) (citation omitted) (punishment fails to comply with due process if rule upon which it is based is so standardless that it authorizes or encourages seriously discriminatory enforcement); *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1035 (D.C. Cir. 1980) (due process requires explicit guidelines in order to avoid arbitrary enforcement and a rule will be invalidated if it is lacking in terms susceptible of objective measurement) (citations omitted).

## **CONCLUSION**

Based on the foregoing, Petitioners and Intervenor respectfully request that this Court vacate the combustible dust-related provisions of the Final Rule.

---

[14] As noted earlier, dust particle size is just one of over a dozen product- and non-product-related factors that the definition of "combustible dust" must comprise.  In that context, enforcement that focuses on only dust particle size is arbitrary and discriminatory.

59

Respectfully submitted,


/s/ Marc L. Fleischaker
Marc L. Fleischaker
Donald C. McLean
Valerie N. Butera
ARENT FOX LLP
1717 K Street, NW
Washington, DC  20036-5342

*Counsel for Petitioners and
Intervenor for Petitioner*


Dated:  February 21, 2014

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND <u>TYPE STYLE REQUIREMENTS</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P.

    32(a)(7)(B) because:

[X]  this brief contains 13,886 words, excluding the parts of the brief exempted

by Fed. R. App. P. 32(a)(7)(B)(iii), or

[  ]  this brief uses a monospaced typeface and contains [*state the number of*]

lines of text, excluding the parts of the brief exempted by Fed. R. App. P.

32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]  this brief has been prepared in a proportionally spaced typeface using

Microsoft Word 2007 in 14 point Times New Roman, or

[  ]  this brief has been prepared in a monospaced typeface using [*state name*

*and version of word processing program*] with [*state number of characters per*

*inch and name of type style*].

Dated:  Feb. 21, 2014                    /s/ Marc L. Fleischaker
                                          Marc L. Fleischaker

                                          *Counsel for Petitioners and*
                                          *Intervenor for Petitioner*

61

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of February 2014, the foregoing Initial

Brief of Petitioners and Intervenor for Petitioners and Addendum was served by

the Court's CM/ECF System on all counsel of record in this matter who have

registered with the CM/ECF System and via Federal Express on:


Heather Renee Phillips
U.S. Department of Labor
(LABR) Office of the Solicitor
200 Constitution Avenue, NW
Washington, DC 20210


Respectfully submitted,

/s/ Marc L. Fleischaker
Marc L. Fleischaker

62